Filed 12/18/13  P. v. Jernigan CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060746 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE258695) |
| MARC EXTER JERNIGAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exharos, Judge.  Affirmed as modified.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia Garcia and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

In 2011, a  jury convicted defendant Marc Jernigan of a 1986 first degree murder (Pen. Code §§ 187, subd. (a)/189)[1] and found true he used a knife in committing the murder (§ 12022, subd. (b)).  The court sentenced him to a prison term of 26 years to life, and imposed various fines and assessments.  On appeal, Jernigan contends the judgment of conviction must be reversed because the court erred when it: (1) denied his motion under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) to dismiss the case because exculpatory evidence was allegedly lost or destroyed by the prosecution; (2) denied his motion to dismiss for unreasonable precharging delay; (3) excluded third party culpability evidence; (4) refused to suspend the proceedings because Jernigan was not competent; (5) gave erroneous instructions on murder, and (6) denied his motion to replace counsel after trial.  Jernigan also asserts there was sentencing error because the court's imposition of a parole revocation fine under section 1202.45 violated ex post facto principles.  The People concede (and we agree) that, because section 1202.45 did not exist at the time of the murder, imposition of a parole revocation fine under that section violates ex post facto principles and must be stricken.

I

PROSECUTION THEORY AND EVIDENCE

A. <u>The Theory</u>

The prosecution's theory against Jernigan was that he knew the victim, June George, had induced her daughter Kathy to break up Kathy's romantic relationship with

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

Jernigan. Shortly before the break-up, Kathy told Jernigan June would be receiving $1500. Two weeks after Kathy broke off the relationship, June was killed in her home, and the killer took cash from June's purse and a diamond from her ring. Although police questioned Jernigan as to his whereabouts at the time of the 1986 killing, they did not link him to the killing at that time because (1) Kathy minimized certain facts about Jernigan in her original statements to police and (2) forensic technology (at that time not capable of DNA testing of the minute quantities of blood on critical items at the crime scene) could not link Jernigan to the crime. However, after advances in forensic technology allowed tests that showed Jernigan's DNA on various items, and after Kathy was more forthcoming with police about his potential involvement, Jernigan was arrested and charged with June's murder.

B. The Prosecution Evidence

*Jernigan's Relationship with Kathy*

In 1986, Kathy lived in La Mesa with June and Kathy's stepfather, Fred. Kathy met Jernigan when they were in high school, and they started dating. The relationship became sexual after about three months. They usually had sex at Jernigan's home, but occasionally had sex in Kathy's bedroom. They did not have sex in either June's bedroom or in June's living room.

Kathy and Jernigan saw each other every day and the relationship was intense. They made long-term plans and discussed living together and getting married. In the beginning, June had no problem with their relationship, and June and Jernigan were cordial. At some point, June learned Jernigan and Kathy were involved in a sexual

3

relationship, and June talked to Kathy about avoiding pregnancy; Kathy shared this with Jernigan.

About six months before June's death, Kathy and Jernigan opened a joint checking account. However, Kathy worked and Jernigan did not. He used the account but never deposited any funds into it, and Kathy paid for nearly all of the expenses for activities they did together. When Kathy began feeling the burden of the financial arrangement, she talked to June about the situation, and Kathy later told Jernigan that June was uncomfortable with Kathy having to spend so much money while he paid so little.

The relationship experienced other problems. They argued over Kathy's wanting to spend time with her friends or go skating. Jernigan questioned Kathy about her activities with her male friends, and he became angry with her when she spent time with others or when she participated in extracurricular activities. They began arguing frequently, sometimes in June's presence, and she would occasionally intercede, telling Kathy she needed to take a break and calm down, or speaking with Jernigan to tell him that he needed to calm down. As Kathy eventually told authorities, June ultimately advised Kathy it was time to break up with Jernigan, and Kathy told Jernigan about June's advice.

Kathy did break up with Jernigan about two weeks before June's death. However, as she later told authorities, she told him (before breaking up with him) that June expected to receive $1500 that June did not want to share with Fred but instead wanted to use the money for a new refrigerator or for dental work for herself. Kathy knew, but did not tell Jernigan, that June kept the money in a filing cabinet in the garage.

4

As Kathy later revealed to authorities, at roughly the same time as she broke up with Jernigan, she also closed their joint bank account and terminated a gym membership she and Jernigan shared and for which she paid out of the bank account. Jernigan was upset about her closing the account and also did not accept the fact she was breaking up with him.

*The Murder*

On August 8, 1986, June took a day off from her job to host a family reunion. She arrived home shortly before 2:00 p.m. and entered her house, carrying a small lunch bag. Kathy came home around 5:20 p.m. and found several relatives waiting outside; she asked where June was but they did not know. Kathy went inside and discovered June's body on the kitchen floor.

La Mesa Police Officer White responded to the scene. There appeared to have been a struggle in the kitchen because there was blood around the kitchen and chips had been knocked out of the porcelain sink. June had been stabbed nearly 80 times. She suffered 36 stab wounds to her chest, including two fatal perforating wounds to her heart and 10 "defects" in her lungs. Other stab wounds were "defensive" wounds to her extremities. She also suffered a blunt force trauma to her head. She bled to death, losing one to two liters of blood. The autopsy revealed a metal fragment, which appeared to be a knife tip, imbedded in her skull. The discovery of the metal fragment apparently led police to return to the house on August 13. The police found a chef's knife with a broken tip in a kitchen drawer. However, this was after the scene had been released and June's family had cleaned up the blood in the house.

5

A paper bag from Anthony's Fish Grotto, containing uneaten food and a time-stamped receipt for a take-out order for "June," was next to the body. The time stamp showed the order was apparently picked up at 1:42 p.m., and it was an approximate 10-to-12 minute drive from Anthony's Fish Grotto to June's home. The receipt also showed the meal was paid for with a $20 bill and cash was given back in change. In the master bedroom, June's purse was on the floor at the foot of the bed. Its contents had been scattered on the carpet and, apart from a two-dollar bill folded inside the wallet, the purse contained no cash. A ring she had been wearing was missing its diamond.

Among the scattered contents of the purse was June's wallet and an eyeglass case with a small stain on it. There were also two bloodstains smeared on the bedspread that had not been there before August 8. Police also found a bloodstained towel on the bathroom floor, a pink stain on the bathroom counter, and a red-stained tissue in the bathroom wastebasket.

*The Initial Investigation into Jernigan's Involvement*

Around 11:00 p.m. on the night of the murder, La Mesa Police Officer Quinn spoke with Jernigan about the murder. Quinn asked if he knew of any reasons someone would want to kill June and Jernigan said he did not. Jernigan also said, in response to Quinn's question, that he held no ill feelings toward Kathy or her family. Quinn collected Jernigan's fingerprints. While fingerprinting him, Quinn observed Jernigan's hands and arms and saw light scratches on his forearms but did not note them in his report.

Kathy did not tell police at that time Jernigan had been upset about Kathy's closing of their joint bank account, or that she had told him about June's recent acquisition of

6

$1500. She also did not reveal Jernigan's jealousy or that he did not like her being with friends, and did not reveal she had told Jernigan that June did not like Kathy's relationship with him. Kathy explained these omissions as attributable to the fact that, at the time of the murder, she could not believe Jernigan had been involved.

*The 1994 Interview*

Police interviewed Jernigan approximately eight years after the murder. He told them he had last seen June a few days before Kathy closed their bank account. He also confirmed he knew June kept a spare key hidden by the front door.

He admitted he had been in the area of June's home on the day of the murder sometime after 5:30 p.m. He claimed he had been planning to return a "Tears for Fears" music cassette to a friend who lived near June, and then to go by Kathy's house, when he saw the police tape around the murder scene. He was unable to get near the house so he returned home, where his mother informed him that police had come by wanting to speak with him. He turned around and went back to the scene.

When asked to account for his whereabouts, he stated he had been doing laundry at his apartment complex. Jernigan told the 1994 interviewers that he first spoke with Detective Burke the day after the murder. Burke had telephoned him to set an appointment for an interview, and he went that day to the police station to talk to Burke, who asked him about his relationship with Kathy and about his whereabouts on the day of the murder. Jernigan told the 1994 interviewers he told Burke he had done laundry on the day of the murder, and told Burke (1) his apartment complex laundry room only had two washers and two dryers, (2) there had been a man who lived at the apartment

7

complex who had been doing his washing and "just keeping the same washer like all day," (3) Jernigan did not know his name but knew where in the complex the man lived. However, Burke did not seem interested in speaking to that man. When the 1994 interviewers asked if anyone else could corroborate that Jernigan was at his apartment, he reiterated he was at his apartment "waiting for Sports Center at [4:00] o'clock, doing my laundry. And . . . that's why I did want them to speak with this man . . . ." The 1994 interviewers, following up on possible corroborative witnesses, then asked if Jernigan had received any phone calls from anybody, and he responded, "I don't know, I might have talked to people, I don't know."

*The 2003 Interview*

In 2000 Detective Brown became interested in solving this cold case. He eventually sent various blood samples to the Department of Justice for DNA testing and, after receiving the results, reinterviewed Jernigan in 2003. Brown asked if there was any chance his blood was on June's wallet, and Jernigan said "no." Jernigan also said there was no chance his blood was on June's bedspread and, when asked if there was any reason his blood might have been on her bedspread, answered, "nothing that comes to mind." When asked again if there was any way his blood could have been in June's bedroom, Jernigan responded, "not that I know of," and said he could not think of any injury at June's house when he had bled. He also told Brown it was likely his fingerprints would be in every room in the house because he had visited there, and he and Kathy had sex in Kathy's room, as well as the living room and den, but they did not have sex in the master bedroom.

8

*DNA Test Results*

Forensic scientist Rogala conducted a Y-STR analysis of the bathroom sink stain. She concluded the stain contained overwhelmingly female DNA matching June, but it also contained some male DNA.[2] Rogala's test determined the Y chromosome in the bathroom sink sample would match one in 3500 males. The George males were excluded, but Jernigan was not.

Criminalist Sonnenburg tested samples from the bloodstained towel found on the bathroom floor. June's blood was on the towel. Although Jernigan's DNA was not found in any of the stains tested during Sonnenburg's first round of tests, his profile matched one of the stains tested during a second round of testing.

Criminalist Spurgeon subjected samples from a number of items of evidence to a Short Tandem Repeat (STR) analysis. She obtained a mixed profile from each of the bloodstains found on the bedspread. In both samples, Spurgeon concluded the major profile matched Jernigan's profile.

Criminalist Milton tested samples of blood found on June's wallet and found a single DNA profile matching Jernigan. Milton's tests on samples from the towel agreed with Sonnenburg's conclusions as to the presence of Jernigan's DNA. Milton's tests on samples from the bedspread agreed with Spurgeon's conclusions that Jernigan was a

---

[2] Rogala explained that Y-STR analysis is not as discriminating as a full profile because all males in a line of descent will display the same Y profile. However, when the sample being tested is overwhelmingly composed of female DNA, Y-STR analysis can be useful because, in those circumstances, the female DNA can "drown out" the male signal unless testing is done on just the Y chromosome content contributed by the male.

9

major donor to those stains. Milton also tested samples from two different areas of a plastic photograph card holder. In one of the samples, an allele was detected at locus D19--a rare allele that Jernigan's DNA possessed. However, Milton's testing had some problems associated with contaminants in a reagent she used, and she also obtained unexpected results in other analyses she conducted during the time she worked on Jernigan's case.

II

DEFENSE THEORY AND EVIDENCE

Jernigan testified in his own defense and denied having anything to do with June's murder. Jernigan and Kathy occasionally stuffed envelopes for June in her home, and he suffered paper cuts while doing so, but he never handled June's purse or wallet. However, Kathy would sometimes go into June's purse to collect the payment June gave them for stuffing envelopes.

Jernigan and Kathy engaged in sex in various places in June's house, but never in June's bedroom. However, he and Kathy used June's bedspread and towels as padding when they engaged in sex on the living floor, and he showered at June's home before and after sex with Kathy.

On the day of the murder, Jernigan spent most of the day at his apartment complex doing laundry. He had to wait in the laundry room for someone to finish before he was able to begin his laundry. He finished around 3:30 p.m. and then watched T.V. until 5:00 p.m. He then left to drive to Helen Bechefsky's house to return a cassette tape to her. The prosecution called Bechefsky to contradict this claim. She testified they had been

10

friends in high school but had not had any contact for 20 years. She said she never loaned any music to Jernigan, and more specifically, had never owned (much less loaned to Jernigan) a "Tears for Fears" tape, and she had never received such a tape from him. Jernigan intended to visit Kathy after returning the tape. In route to Bechefsky's house, he passed June's house but stopped nearby because he noticed yellow tape around the house. He got out and lingered for a while talking to people on the street before returning to his home without dropping off the tape. When he returned home, Jernigan learned a police officer had been to his home and wanted to speak with him. He went to the police department, where he was interviewed and fingerprinted. He had no injuries on his hands when he was fingerprinted. The following day, Jernigan went back to the police station to give blood. In rebuttal, La Mesa Police Officers Lee and Quinn testified they did not make arrangements with Jernigan to give blood on August 8 or 9, 1986, and they were not aware of anyone from June's family being asked to provide (or actually providing) blood samples at that time.

A major theme of Jernigan's defense at trial consisted of the alleged acts and omissions of La Mesa Police Officer Burke (deceased at the time of trial). Jernigan testified he spoke to Burke on August 11, 1986, at the La Mesa Police Department and was asked to lift his shirt and have his hands and arms examined. Jernigan had no scratches on his arm. Jernigan received a call later that week and was asked to return to the station. At that time, Burke asked him about Kathy's alleged drug use. Jernigan told Burke she did not use drugs. When Burke claimed a Ms. Seljan told him that Kathy and Seljan had used methamphetamine together, Jernigan did not believe him.

11

Jernigan testified he was scheduled to again return to the station about a week and a half later but fell asleep. When he woke, Burke was at his house. Burke asked about June and Fred's relationship, and also inspected Jernigan's shoes. In rebuttal, La Mesa Officer Howard testified he had reviewed all of the records relating to the investigation, and there was no record of Burke going to Jernigan's house, or any reports that Burke had asked to see Jernigan's shoes. Howard explained that, to do a shoeprint comparison, it would have been necessary to impound the shoes, not merely view them at a residence. Jernigan testified Burke also asked him to show Burke where in the complex the man who was in the laundry lived, and Jernigan walked with Burke down the pathway to the back side of the complex. In rebuttal, Howard also testified there was no record of Burke going to the residence of the man who allegedly saw Jernigan doing laundry.

Jernigan testified Burke also asked him at that time for a copy of his telephone bill because he was on the telephone while doing his laundry on the afternoon of the murder. Jernigan took a copy of the bill to Burke when it arrived. In rebuttal, Howard also testified there was no record or reports of Jernigan telling Burke he was on the telephone during the time of the murder. Howard found no telephone records belonging to Jernigan, and the first time Howard heard of this claim was after Burke died.

In May 1988, Burke asked Jernigan to come to the police station again because Burke was interested in a drug dealer, Joe Maraneci, a friend of Kathy's with whom she

lived after June's death. After the interview, Burke drove an unmarked police car, and Jernigan sat in the front seat and directed Burke to Maraneci's residence.[3]

Because Maraneci was not home, they returned to the police department and Burke asked Jernigan to look at some photographs to help identify Maraneci. Jernigan waited in an interview room and Burke left, returning with a bag with a purse in it. Burke removed numerous items from the purse and put them on the desk in front of Jernigan. Jernigan saw the photographs and believed they were from Kathy's purse, and did not know the items had come from June's purse. He and Burke, wearing neither gloves nor masks, went through the photographs trying to find one of Maraneci. Jernigan handled both the photographs and the wallet from the purse. He did not believe he had any injuries that day, but he had just come from playing football when Burke arrived at his house that day. In rebuttal, Howard testified there was no record or reports of Burke showing June's wallet to Jernigan. McElroy also testified, based on his personal observations, that Burke always wore gloves when handling evidence in an open major case investigation. McElroy testified that, under the policy and procedures in effect at that time, (1) a civilian was never allowed to handle impounded evidence in an open

---

3    In rebuttal, La Mesa Officer McElroy testified he was with Burke when they interviewed Jernigan in May 1988. After the interview, McElroy saw Burke walk Jernigan to the lobby at the *front* of the building, the normal path for an interviewee to leave. The unmarked cars available to Burke were parked at the *back* of the building. McElroy also testified that, under the policy and procedures in effect at that time, an officer would never go alone with a civilian seated in the front to locate an individual's address. Instead, two officers would go, with the assisting civilian seated in the back seat (where there were blacked out windows), and one officer would drive and the second would record the address or descriptions of the person the officers were seeking.

major case investigation and (2) McElroy had never seen Burke permit a civilian to handle impounded evidence in an open major case investigation. Finally, McElroy explained, the way to obtain photographs of people of interest was either to get copies of a mug shot (if the person had previously been arrested) or a DMV photograph.

III

ANALYSIS

A. The *Trombetta* Claim

Jernigan contends the trial court erred when it denied his motion to dismiss, or for other sanctions, based on the alleged failure of the police to preserve three items of evidence with exculpatory value: (1) a copy of a telephone bill he allegedly gave to Burke, (2) the DNA in an alleged "bloody fingerprint" on a photograph holder, and (3) alleged DNA on the knife used to kill June.

*Background*

Jernigan moved to dismiss the prosecution, or to suppress all DNA evidence, because the government allegedly did not preserve exculpatory evidence. The motion claimed (without evidentiary support) that Jernigan, at the request of an unidentified member of the La Mesa Police Department, gave police a copy of his telephone bill documenting calls he made from his apartment during the time window in which the murder occurred, and that it was not preserved. The motion also claimed there was blood evidence, found on a "ridge line" of a fingerprint on a photograph holder from June's wallet, that would have been exculpatory but had not been preserved. In his supplemental *Trombetta* motion, Jernigan claimed there was blood evidence on the

14

murder weapon that, because of improper storage of the weapon by police, had deteriorated so that it was incapable of being tested for DNA. Jernigan argued these failures warranted dismissal of the prosecution under *Trombetta*.

The prosecution opposed the motion. As to the telephone bill, the prosecution noted (1) there were no police reports suggesting Jernigan gave police a telephone bill or that one had been impounded, and Jernigan's motion did not reveal the identity of the officer to whom he allegedly gave the bill, (2) any telephone bill would not have shown who was using the telephone in Jernigan's apartment (because he lived with his mother at that time), (3) a record showing some calls made from the apartment would not have been inconsistent with Jernigan committing the murder because the precise time of the murder was unknown and his apartment was close enough to June's home to allow him to return home and place telephone calls, and (4) this contention conflicted with Jernigan's 1994 statement to police when he told them he was doing laundry and could not recall if he talked to anyone on the telephone. As to the "bloody fingerprint," the prosecution noted (1) the fingerprint was a latent rather than patent print, (2) it is speculative that it was made by the murderer at or near the time of the murder, and (3) the blood was mere flecks around the edge of the print and (at the time of the murder) San Diego Sheriff's lab criminalists did not preserve or process evidence for DNA testing because of limits on existing technology. As to the blood evidence on the knife, the prosecution noted (1) the knife was only seized from June's cutlery drawer five days after the murder (based on the discovery that a metal tip embedded in June's skull matched the knife) and there was no evidence any blood was seen on the weapon at that time, and (2) San Diego Sheriff's lab

15

criminalists did not preserve or process evidence for DNA testing because of limits on existing technology. The prosecution contended Jernigan had not shown any of these items of evidence had apparent exculpatory value, and had not shown police acted in bad faith when they did not preserve them; and therefore his *Trombetta* motion should be denied.

The court, relying on the pleadings and Jernigan's offer of proof, assumed for purposes of ruling on the motion that the telephone bill existed, and evaluated whether Jernigan's showing satisfied his burden of demonstrating a violation of due process within the meaning of *Trombetta* and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*). The court concluded Jernigan had not shown any evidence of bad faith by the authorities when these items were not preserved for later scientific testing or were destroyed, and he had not shown any of these items had some exculpatory value known to police at the time the items were not preserved or were allegedly destroyed. However, the court recognized Jernigan had not yet developed an evidentiary record that might have altered these pivotal findings, and therefore denied the motion without prejudice to Jernigan's ability to renew the motion during trial after key witnesses testified to facts concerning the specific items. Jernigan did not renew his motion during trial. Jernigan did move for reconsideration, but only on the ground he might have mistakenly conceded a point of law relevant to the ruling. The court denied the motion for reconsideration.

*Legal Standards*

The standards for law enforcement's duty to preserve evidence under the due process clause of the Fourteenth Amendment are well established. Law enforcement

16

must preserve evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra*, 467 U.S. 479, 488.) That duty applies "only if [the evidence] possesses exculpatory value 'apparent before [it] was destroyed,' and not obtainable 'by other reasonably available means.' " (*People v. DePriest* (2007) 42 Cal.4th 1, 41.) "The state's responsibility is further limited when the defendant challenges the failure to preserve evidence 'of which no more can be said than that it could have been subjected to tests' that might have helped the defense. [(*Youngblood*, *supra*, 488 U.S. at p. 57.)]) In such a case, unless the defendant can show 'bad faith' by the police, failure to preserve 'potentially useful evidence' does not violate his due process rights. [(*Youngblood*, *supra*, at p. 58.)]" (*People v. DePriest,* at p. 42.)

When reviewing a trial court's ruling on a *Trombetta* motion, "we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510 [applying substantial evidence standard to whether the evidence at issue possessed exculpatory value that was apparent before it disappeared, and to whether the disappearance was inadvertent and not the product of bad faith conduct by the police].)

*Analysis*

Regarding both the blood flecks around the edge of the print and the alleged blood evidence on the knife, Jernigan's argument is that these should have been better preserved because they might have been subjected to testing 20 years later to extract possibly exculpatory DNA. However, the court found Jernigan's showing was inadequate to prove either that these items had some exculpatory value known to police at the time the items

17

were not preserved, or there was any evidence of bad faith by the authorities when they failed to preserve these items for later scientific testing. In *Youngblood*, the court rejected the appellant's due process claim on analogous facts. The appellant in *Youngblood* argued, among other things, that the failure to properly refrigerate clothing from the victim prevented him from testing it to determine if it provided exonerating evidence and therefore warranted sanctions. (*Youngblood, supra*, 433 U.S. at pp. 54-55.) Rejecting the argument, *Youngblood* observed:

> "[T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta, supra*, 467 U.S., at [p.] 486 . . . that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, [citation] as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. [¶] In this case, the police collected the rectal swab and clothing on the night of the crime; respondent was not taken into custody until six weeks later. *The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent.* None of this information was concealed from respondent at trial, and the evidence—such as it was—was made available to respondent's expert who declined to

18

perform any tests on the samples. The Arizona Court of Appeals noted in its opinion—and we agree—that there was no suggestion of bad faith on the part of the police." (*Id*. at pp. 57-58.)

Jernigan did not show that either the blood flecks or the murder weapon had some exculpatory value *known* to police at the time the items were not preserved. Moreover, as noted by the court when ruling on the motion, defense counsel conceded the defense showing at the hearing on his *Trombetta* motion did not demonstrate police acted in bad faith when they decided not to preserve either the blood flecks or the murder weapon. We conclude that, as to these items, substantial evidence supports the court's ruling.

We also conclude the court's ruling regarding the alleged missing telephone bill is supported by substantial evidence. First, although the court assumed (for purposes of its ruling) Jernigan had given authorities a copy of his bill, Jernigan made no evidentiary showing it had some exculpatory value *known* to police so that it should have been preserved, much less that police acted in bad faith by not retaining it. There was no offer of proof that telephone bills in 1986 recorded local calls placed from a telephone, or any claim that any long-distance calls were made during the relevant time frame. Moreover, even if the telephone bill would have shown the telephone had been used during the relevant time frame, the bill would not have shown *who* was using the telephone in Jernigan's apartment. Finally, a record showing some telephone calls made from the apartment would not necessarily have been inconsistent with Jernigan committing the murder, because the precise time of the murder within the time frame was unknown, and there was no evidence that Jernigan's apartment was too far from June's home to allow him to return home and place calls.

19

More importantly, Jernigan's *Trombetta* motion asserted he gave police a *copy* of his telephone bill, not that he gave them the *original* bill and was left without a copy thereof. In *People v. Velasco* (2011) 194 Cal.App.4th 1258, the defendant was convicted of possessing a weapon while in penal custody, which weapon was discovered to be secreted in a pocket sewn into his boxer shorts. (*Id*. at pp. 1260-1261.) Prison personnel did not preserve the shorts as evidence, and they did not photograph them, but instead let defendant continue to wear them. (*Ibid*.) He argued this failure to gather and/or preserve the evidence violated *Trombetta*. Rejecting that argument, *Velasco* observed:

> "In such circumstances, we doubt that any due process violation can occur. 'Due process requires the state preserve evidence *in its possession* where it is reasonable to expect the evidence would play a significant role in the defense.' [(*People v. Alexander* (2010) 49 Cal.4th 846, 878, italics added by *Velasco*.)] There is no evidence that the state ever possessed the shorts. It is axiomatic that the constitutional due process guaranty is a bulwark against improper state action. '[T]he core purpose of procedural due process [is] ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.' [Citation.] If the state took no action, due process is not a consideration, because there is *no 'loss of evidence attributable to the Government*.' [(*Youngblood*, at p. 57.)] The state 'might transgress constitutional limitations if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial.' [(*Trombetta*, *supra*.)] *When, however, defendants are allowed to keep the evidence for themselves, there is no exercise of any sovereign power and no due process violation.* [¶] A contrary rule would make the state a caretaker for defendants' exculpatory evidence even though the state did not control or possess the evidence. Such a rule would make no sense. . . . Everything in the record points to defendant's continued retention of the shorts that he asserts might constitute exculpatory evidence. The state has not stopped him from using them to exculpate himself if they are exculpatory." (*Id*. at p. 1263, italics added.)

We agree with *Velasco* that, if the state has not by its conduct *deprived* a defendant of allegedly exculpatory evidence, a defendant cannot assert a denial of due process merely because evidence over which he originally had (and retained) actual dominion was not thereafter warehoused by the state for his benefit.

As a general matter, due process does not require the police to collect particular items of evidence (*People v. Frye* (1998) 18 Cal.4th 894, 943, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), and California cases have uniformly rejected due process claims based on a failure to collect evidence. (See, e.g., *Frye*, at p. 943 [no duty to collect additional bloodstains and other items at crime scene]; *People v. Daniels* (1991) 52 Cal.3d 815, 855 [no duty to perform gunshot residue test on witness]; *People v. Farmer* (1989) 47 Cal.3d 888, 911 [no duty to take "more and better photographs" of footprints], disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6; *People v. Hogan* (1982) 31 Cal.3d 815, 851 [no duty to collect scrapings from victim's fingernails], disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836; *People v. Bradley* (1984) 159 Cal.App.3d 399, 405-406 [no duty to collect bloodstains].) In each of those cases, even though the defendant lost evidence *solely* because of state inaction, there was no due process violation. Here, Jernigan's "lost" evidence was *not* attributable solely to state action or inaction, providing even fewer grounds for concluding his due process rights were offended.

B. The Precharging Delay Claim

*Background*

Although Jernigan was apparently interviewed early in the investigation, no charges were filed against him until nearly 20 years after the murder. Jernigan moved to dismiss the charges, arguing the delay was unjustifiable, and he was prejudiced because he lost the ability to locate the "laundry room" witness and/or the physical evidence of his telephone bill to support his claimed alibi, and he had lost access to certain physical evidence either not collected or not preserved to allow for testing that would have produced exonerating information. Jernigan made a host of other claims of prejudice, including that the initial statements of percipient witnesses had been lost, blood evidence had been contaminated, Burke and another witness had died, and other witnesses may have had their memories altered by false information provided by police to the witnesses. On appeal, Jernigan has not resurrected these claims of prejudice (except as to the death of Burke) to assert the trial court's ruling was an abuse of discretion, and we therefore do not recite the trial court's findings and conclusions as to those matters.

The trial court held evidentiary hearings over several days to examine Jernigan's claims concerning the prejudice from the delay and heard extensive argument on his motion. The trial court found the delay in charging Jernigan did not violate his federal due process rights because the delay was not motivated by a desire to gain a tactical advantage. The court found that, although there was a lengthy delay in bringing the charges, the delay was not the result of negligence by the authorities, but was instead because then-existing technologies did not allow prosecutors to determine the identity of

the murderer. The trial court concluded the delay was attributable to "investigative delay."

On appeal, Jernigan notes the trial court found "[t]here was a purposeful delay." However, we do not construe the trial court's use of this nomenclature as intending to employ "purposeful" as a term of art. When courts have used the term "purposeful delay," it appears to refer to those delays motivated by a desire to gain a tactical advantage (see, e.g., *People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*) [" 'whether the delay was negligent or purposeful is relevant to the balancing process [and] [p]urposeful delay to gain an advantage is totally unjustified' "]), which essentially equates with the *same* type of conduct that would violate federal due process rights. (See, e.g., *U.S. v. $8,850* (1983) 461 U.S. 555, 563.) Because the trial court here specifically *rejected* Jernigan's federal due process claim, we do not construe the court's use of the term "purposeful" to intend to convey a finding that only a "relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation." (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

The court then made extensive findings as to each of Jernigan's claims of prejudice. As to the alleged lost telephone bill, the court found Jernigan "has not proved that this evidence was lost [and therefore] has not been able to show he was prejudiced . . . ." The court noted the police files contained no reference to any telephone bill, and the only evidence was Jernigan's "assertion he provided the original [to police and] it was copied, and . . . returned to him . . . ." Moreover, the court noted Jernigan's 1994 statement claimed he had been doing the laundry and wasn't sure if he'd made any

23

telephone calls. Additionally, the court noted the telephone bill was of marginal value to Jernigan and would not have been exculpatory, because the time of death was sometime during an almost three-hour window, and a phone bill (1) would not show who was using the telephone during that window, and (2) might only have contained entries of calls not inconsistent with Jernigan's committing the crime before returning home to make those calls. His inability to locate the telephone bill did not cause significant prejudice to Jernigan.

Regarding the lost ability to locate the "laundry room" witness, the court concluded he had not shown significant prejudice as a result of the inability to locate this alleged witness because (1) the time of death was uncertain and therefore the laundry room witness's sporadic encounters with Jernigan would not have provided him with an alibi for the majority of the afternoon in which the victim was slain, and (2) Jernigan did not know the person he encountered in the laundry room and it is therefore speculative that the witness would have known or remembered Jernigan's presence that day. Although not articulated by the court, Jernigan stated during his 1994 interview that he was at his apartment "waiting for Sports Center at [4:00] o'clock, doing my laundry [and] that's why I did want them to speak with this man . . . ." A witness who might have seen Jernigan doing laundry sometime before 4:00 p.m. may have been both of marginal benefit (because it would not have excluded Jernigan from having killed June shortly after she arrived home around 1:45 p.m.) and could have been affirmatively unhelpful (because it could have opened an argument that Jernigan *needed* to do laundry shortly after the murder to cleanse blood from the clothes he had been wearing).

24

Regarding the fact Detective Burke had died before trial, the court concluded Jernigan had not shown prejudice beyond speculation that Burke might have remembered facts about the investigation not contained in the police files. Finally, regarding the "deterioration" of DNA evidence on the knife, the court concluded Jernigan had not shown that (had charges been filed sooner or the knife preserved differently) DNA evidence could have been extracted from the blood on the knife because there was minimal trace evidence on the knife by the time police recovered the weapon. The court found there was no prejudice established from the delay as to the knife evidence.

Against the de minimus showing of prejudice, the court then weighed the justification for the delay in filing charges against Jernigan. The court found scientific testing available at the time of the murder produced "insufficient evidence to determine precisely who the murderer was," and that Jernigan was charged only after evolving scientific techniques (and in particular Y-STR testing not available in 1986) allowed police to view the evidence in a new light to determine sufficient evidence pointed to him as the murderer. The court concluded the delay was solely based on investigative delay and, even if Jernigan "might have been--and I emphasize this term--somewhat prejudiced by the lapse of time," the decision to await filing charges until after science allowed for "reevaluation of the evidence based on information now known to the investigators and criminalists makes the justification for the delay sufficient in the court's opinion to overcome the alleged prejudice to the defendant that he might suffer . . . ."

25

*Legal Principles*

The due process clauses of the federal and state Constitutions protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*); *U.S. v. Lovasco* (1977) 431 U.S. 783, 789-792.) In *Cowan, supra,* 50 Cal.4th 401, our Supreme Court recently explained the standards applicable when the appellant (as here) complains not about the delay after he or she has been arrested and charged, but about the delay between the crime and the decision to charge the defendant. A delay in arresting or charging does not implicate the defendant's state and federal speedy trial rights because those rights do not attach until a defendant has been charged. (*Nelson, supra*, 43 Cal.4th at p. 1250.) *Cowan* explained that, under those circumstances, the defendant:

> "is 'not without recourse if the delay is unjustified and prejudicial. "[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence." [Citation.] Accordingly, "[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." [Citation.]' (*Nelson, supra*, 43 Cal.4th at p. 1250.)" (*Cowan, supra,* 50 Cal.4th at p. 430.)

A defendant may demonstrate prejudice by showing a loss of material witnesses because of lapse of time, or a loss of evidence because of fading memory attributable to

26

the delay. (*People v. Catlin* (2001) 26 Cal.4th 81, 107.) The courts, describing the required showing as one of "actual prejudice," have stated that a showing based on bare "conclusory assertion[s]" of harm (see *Serna v. Superior Court* (1985) 40 Cal.3d 239, 250 [addressing speedy trial rights]) not "supported by particular facts" showing lost evidence (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442) will not suffice to establish a denial of due process. The courts have refused to apply a presumption of prejudice even where the delay between the crime and the decision to prosecute is a lengthy one. (*Nelson, supra,* 43 Cal.4th at pp. 1249-1250 [no presumption of prejudice even when delay between crime and charging was 26 years].)

As to what may constitute sufficient justification for delay, *Cowan* explained that under California law:

> " 'negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. This does not mean, however, that whether the delay was purposeful or negligent is irrelevant.' (*Nelson, supra*, 43 Cal.4th at p. 1255.) Rather, 'whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' (*Id*. at p. 1256.) *The justification for the delay is strong when there is 'investigative delay, nothing else*.' (*Ibid*.)" (*Cowan*, *supra*, 50 Cal.4th at p. 431, italics added.)

*Cowan* also explained that appellate review of a trial court's order on a motion to dismiss based on precharging delay is deferential: we review for an abuse of discretion and defer to any underlying factual findings if substantial evidence supports those findings. (*Ibid*.)

*Evaluation*

Jernigan argues the trial court abused its discretion because it erred in concluding he had not demonstrated significant prejudice from the delay, and in concluding there was substantial justification for the delay.  We are not persuaded by either argument.

First, Jernigan argues on appeal he demonstrated significant prejudice from the delay because the person who purportedly saw him in the laundry room was not able to be located, and Jernigan did not keep his telephone bill, and these undermined his ability to buttress his alibi defense and permitted the prosecutor to suggest his alibi was a fictional creation.  However, substantial evidence supports the court's finding that Jernigan did not prove the telephone bill was "lost" by police), and nothing about the delay prevented him from retaining a document he presumably knew (from the purported fact he made a special trip to deliver it to police)[4] represented significant evidence of his innocence.  (Cf. *People v. Cowan, supra*, 50 Cal.4th at p. 432 [rejecting claim of prejudice from lost evidence and alibi witnesses caused by delayed prosecution where defendant knows he is a suspect in homicide because he had "an incentive to record any exculpatory information he had regarding his whereabouts . . . or the identity of alibi witnesses "].)  Additionally, substantial evidence supports the court's finding the telephone bill was of marginal value to buttressing Jernigan's alibi defense, and any harm

---

4      Jernigan testified Burke asked him, during telephone conversations in 1986, for a copy of his telephone bill to verify he was on the telephone on the afternoon of the murder, and he took a copy of the bill to Burke when it arrived.

from the loss of that bill was speculative.[5]  Jernigan's inability to locate the bill did not

cause significant prejudice to him.  Regarding the lost ability to locate the laundry room

witness, there was again substantial evidence to support the court's finding Jernigan had

not shown significant prejudice as a result of the inability to locate this alleged witness

because the time of death was uncertain (and therefore the laundry room witness's

sporadic encounters with Jernigan would not have provided him with an alibi for the

majority of the afternoon in which the victim was slain), and the person he encountered in

the laundry room was a stranger to him and it is therefore speculative the witness would

have known or remembered his presence that day.  He also asserts on appeal that,

because Burke died during the delay, Jernigan was deprived of the ability to show

(through Burke's testimony) that the proffered alibi was not a recent concoction.

However, Jernigan had some evidence (e.g. the transcript of the 1994 interview) that the

laundry room witness claim *had* been earlier proffered.  Indeed, even had Burke been

able to testify, it appears he would have confirmed Jernigan made the laundry room

witness claim but would *also* have testified Burke *disbelieved* Jernigan's claim about the

---

[5]      The evidence showed the murder occurred sometime during an almost three-hour
window.  Although Jernigan suggests there was evidence pinpointing the time of the
murder, based on a termite control employee working near June's home who heard a
female scream around 1:45 p.m., Jernigan's evidence for that assertion relies solely on a
police report in which the employee reported he arrived at the job near June's home
around 11:30 a.m. and heard a female scream about 15 minutes later.  This scream would
have been almost two hours *before* June arrived home.  Because the precise time of the
murder remains uncertain, a bill containing only a few entries of calls would not
necessarily have been inconsistent with Jernigan's committing the crime because it would
not show *who* was using the telephone, nor would it show (absent entries covering the
almost three-hour window) Jernigan was home during the *entire* three-hour period.

laundry room witness because he had learned Jernigan had told other people he was at a friend's house at the time of the murder.

Jernigan also argues on appeal that he demonstrated significant prejudice from the delay because the blood evidence on the knife used to kill June had deteriorated to the extent that DNA testing of that evidence was no longer viable. However, there is substantial evidence to support the court's findings that Jernigan did not show, had charges been filed sooner or the knife preserved differently, DNA evidence could have been extracted from the blood on the knife. Sheriff's criminalist Merritt testified DNA testing was not available to the sheriff's department in 1986; criminalist Spurgeon testified that DNA testing techniques in the mid-1990's required "[m]uch more" of the sample; and criminalist Milton testified it could have been detrimental (even in the mid-1990's) to have tried to test the knife for DNA because the technology "at that time was pretty limited" and testing could have "consumed [the sample] with little or no information obtained by the testing available at that time."

Against this speculative prejudice, the trial court found the delay was not the result either of a purposeful effort to obtain a tactical advantage or of a negligent investigation, but was instead attributable to "investigative delay." There was substantial evidence to support the latter conclusion. The court found, and the evidence supports the finding, that scientific testing available at the time of the murder produced "insufficient evidence to determine precisely who the murderer was," and the evidence showed another person (Gerald Glazebrook) was still a primary suspect as late as 2001. The court found that it was only because evolving scientific techniques allowed a retest of the evidence starting

30

in 2001 that police eventually determined sufficient evidence pointed to Jernigan as the murderer.

Jernigan does not claim on appeal that the evidence compelled a different finding. He does not suggest that the evidence conclusively showed testing capabilities available to authorities in 1986 would, if employed, have yielded sufficient DNA evidence showing Jernigan was the murderer. Instead, he appears only to argue that later technologies (such as early PCR testing, which was starting to be developed in the late 1980's) might have produced sufficient evidence if those were employed as they became available, thereby reducing the delay in prosecuting him. However, a similar argument was rejected in *Nelson, supra*, 43 Cal.4th at pages 1256-1257, in which the court observed, "Defendant argues that the DNA technology used here existed years before law enforcement agencies made the comparison in this case and that, therefore, the comparison could have, and should have, been made sooner than it actually was. Thus, he argues, the state's failure to make the comparison until 2002 was negligent. We disagree. A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. '[T]he necessity of allocating prosecutorial resources may cause delays valid under the *Lovasco* analysis. [Citation.] Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay. . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." The court concluded the delay was solely based on investigative

31

delay and that this legitimate basis for delay was sufficient justification to overcome the alleged prejudice Jernigan might suffer.

Here, "the justification for the delay was strong [and was] investigative delay, nothing else. The police may have had some basis to suspect defendant of the crime shortly after it was committed . . . .  But law enforcement agencies did not fully solve this case until . . . a comparison of defendant's DNA with the crime scene evidence resulted in a match, i.e., until the cold hit showed that the evidence came from defendant.  Only at that point did the prosecution believe it had sufficient evidence to charge defendant.  A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges.  'The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. . . .  Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . .  Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided.  A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' [(*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914-915; citations).]"  (*Nelson, supra*, 43 Cal.4th at p. 1256.)  We believe this reasoning is controlling and therefore

32

conclude the trial court did not abuse its discretion when it denied Jernigan's motion to dismiss for precharging delay.

C. Preclusion of Third Party Culpability Evidence

Jernigan moved to admit evidence of third party culpability as to eight different suspects. The trial court rejected all of his motions. Although he moved to have evidence as to eight suspects admitted, his opening brief does not claim any error on appeal as to the rulings excluding evidence for four of those suspects (David George, Kathy Keller, Fred George and John Keller). We limit our evaluation to the claims of error asserted on appeal that it was an abuse of discretion to reject the third party culpability evidence as to Messrs. Glazebrook, Peraza, Peterson and Wallenius. Jernigan argues on appeal that some of the evidence was admissible under the standards articulated by *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*) and therefore the court abused its discretion in excluding it.

*Legal Standards*

In *Hall,* the Supreme Court explained:

> "To be admissible, the third-party [culpability] evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime. [¶] . . . [¶] [C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay,

33

prejudice, or confusion [under Evidence Code section 352]."  (*Hall, supra*, 41 Cal.3d at pp. 833-834.)

Under controlling law, mere motive is not sufficient to warrant introduction of third party culpability evidence.  (*People v. Kaurish* (1990) 52 Cal.3d 648, 685.) Evidence of "mere . . . opportunity to commit the crime . . . , without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the *actual perpetration* of the crime." (*Hall, supra*, 41 Cal.3d at pp. 833, italics added.)  Merely proving a third party with a motive to commit the crime lacks an alibi, and had the opportunity to commit the crime, will not warrant introduction of third party culpability evidence.  (*People v. Pride* (1992) 3 Cal.4th 195, 238.)

Because third party culpability evidence should "simply [be] treat[ed] . . . like any other evidence [and] if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion [under Evidence Code section 352]" (*Hall, supra*, 41 Cal.3d at p. 834), the trial court's ruling on the evidence may not be disturbed absent a showing that its ruling was an abuse of discretion.  (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373.)

*Analysis*

The trial court ruled on Jernigan's motions to admit third party culpability evidence based solely on the written offers of proof submitted by him as to each potential third party, and the written rebuttal filed by the prosecution in opposition to these offers

34

of proof. Our evaluation of whether the trial court's rulings were an abuse of discretion is limited to the showings made in connection with Jernigan's motions.

Glazebrook

The offer of proof as to Jernigan's proposed suspect, Gerald Glazebrook, claimed Glazebrook dated a friend of June's (Ms. Knight) and quickly became infatuated with Knight, pursuing her despite her efforts to break things off; Knight believed Glazebrook became romantically interested in June immediately after meeting her; he discussed knives with June; he sent her gifts and stalked her, making June uncomfortable; Glazebrook's infatuation with June was because June physically resembled Glazebrook's ex-wife, who had been the victim of an unsolved knife attack by a masked assailant; police identified Glazebrook as a suspect in June's attack; and Glazebrook had provided a "false alibi" and refused to cooperate with police.

In opposition, the prosecution argued (with evidentiary support from an investigator's report of his interviews with Knight and Glazebrook) Glazebrook was not romantically interested in June; he briefly discussed knives with June at a party because he worked for Buck Knives; and he had a chance encounter with June at a local shopping mall but was not stalking her. Regarding the unsolved knife attack on Glazebrook's ex-wife, the evidence was that the attacker was unmasked and, according to his ex-wife, Glazebrook was never a suspect and the idea that he was a suspect in her attack was "absurd." Regarding his alleged noncooperation with police, Glazebrook *did* cooperate by giving them fingerprints and providing receipts for the time period, and he only ceased cooperating when he declined to give them a second set of prints (since he had already

35

given them his prints) and declined (on the advice of counsel) to take a polygraph. Regarding his alleged "false alibi," the prosecution argued Glazebrook had provided receipts from stores he claimed to have been at during the time of the murder and, moreover, Glazebrook's neighbor recalled seeing him arrive home on the afternoon of the murder and that he looked and acted normally and displayed no injuries or blood on him at that time.

The trial court denied the motion as to Glazebrook because it found "[t]here's nothing there," other than that police tried to "paint him as a strange person" and that Glazebrook had "speculated as to Buck Knives," for whom he worked. Jernigan argues the ruling was an abuse of discretion because Glazebrook's tender of a "false alibi" could permit an inference of consciousness of guilt. His account of his movements was that he went to a bank in Santee between 1:00 and 1:15 p.m., to a lamp store in La Mesa around 2:30 p.m., and went to a blueprint shop in La Mesa around 3:00 p.m., and then returned home. The only evidence of "falsity" was that, in an affidavit in 1987 seeking a warrant to retake Glazebrook's fingerprints, the affiant declared that employees at the lamp store told police they had "never saw him before." The fact some employees could not *recall* Glazebrook's presence in a store is not proof of a "false alibi." Moreover, there was some evidence that Glazebrook *had* been at the lamp store (at least at some point in time) because he described an employee who waited on him and that employee (Ms. Allred) apparently testified (in a later civil deposition) that she recalled seeing him in the store as he originally claimed. Moreover, police verified he *was* at the blueprint store by 3:00 p.m., apparently unmarked and unbloodied, despite Jernigan's theory that Glazebrook had

36

murdered June in the prior 90-minute window.  The alibi was merely *uncorroborated*, and then as to only *one* of the mentioned stores, and the lack of corroboration of his whereabouts is not sufficient proof to require admission of the third party culpability evidence.  (*People v. Pride, supra,* 3 Cal.4th 195, 238.)  The trial court's ruling as to Glazebrook was not an abuse of discretion.

Jose Peraza

The offer of proof as to Jernigan's next proposed suspect, Jose Peraza, claimed that one day after June's murder Peraza was apprehended after he (along with an accomplice who was not apprehended) committed a daytime burglary in the vicinity of June's home.  The stolen car Peraza was driving at the time he was apprehended contained a bloody shirt and had blood on the floor and the passenger door.  Jernigan's offer of proof also claimed two other facts tied Peraza to the actual murder, but neither "fact" withstood scrutiny.  First, Jernigan claimed the stolen car Peraza was driving resembled a car a witness spotted in the alley adjacent to June's home around 1:30 p.m. on the day she was killed, and the same witness heard a scream approximately 15 to 20 minutes later.  However, *neither* the time frame *nor* the alleged match between vehicles was supported by the offer of proof.  The offer of proof relied on the statement of a witness that he arrived to work near June's home around 11:30 a.m. and heard a female scream about 15 minutes later, more than two hours before June arrived home.  Moreover, the witness's statement described the car he saw as a "dark blue or dark green Buick Regal or similar vehicle, with a full chrome front end and four rectangular headlights . . . [and] thinks [it] had a padded vinyl roof, 'because it stuck up a little bit.' "  Although this description

37

could have matched June's "*dark blue* Pontiac Grand Prix, with a chrome grill, four rectangular headlamps, and a half length padded vinyl roof" (italics added), the stolen car driven by Peraza was a 1976 *bronze colored* Grand Prix. Jernigan's offer of proof also claimed Peraza "made repeated statements on the night [of the murder] that he had some problems earlier that day with a [woman] who came home and he had to stab her," but the prosecution's opposition below pointed out this hearsay statement was unsupported by any suggestion of what admissible evidence would be produced to support this claimed "fact." Jernigan did not argue this point at the hearing on the motion, and on appeal has abandoned any reliance on this alleged statement.

In opposition, the prosecution argued tests excluded June as the source of the bloodstains on the shirt and in the car, and no DNA from Peraza been linked to the site of the homicide. The prosecution argued the only basis for Jernigan's argument was that (1) Peraza had "opportunity" and (2) Peraza's daytime burglary in the same general area went beyond "propensity" evidence and was admissible because it involved a similar "modus operandi." The prosecution argued exclusion of similar third party culpability evidence was upheld in *People v. Von Villas* (1992) 10 Cal.App.4th 201, in which, although the two robberies occurred in the same general area and involved the same type of establishment, the modus operandi were very different between the two robberies. (*Id.* at pp. 265-267.) The prosecution argued the modus operandi here were completely different, in that (1) Peraza's burglary involved forced entry into the home using a screwdriver and no forced entry was used in June's home, and (2) Peraza fled his burglary when a surprise confrontation with a witness occurred whereas the defense theory

38

necessarily posited he did not flee (but instead stabbed June) when similarly surprised by a witness.

The trial court rejected Jernigan's motion as to Peraza as "speculative and remote." Because the only evidence implicating Peraza was that he was apprehended after he committed another daytime burglary in the vicinity of June's home, the evidence at most showed "opportunity," and the denial of the motion as to Peraza was not an abuse of discretion. (Accord, *People v. Lewis, supra*, 26 Cal.4th at p. 372-373 [propensity evidence without more does not satisfy admissibility standards of *Hall*]; *Hall, supra*, 41 Cal.3d at pp. 833 ["mere . . . opportunity to commit the crime . . . , without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."]

Christopher Peterson

The offer of proof as to Jernigan's proposed suspect, Christopher Peterson, claimed Peterson was Kathy's ex-boyfriend who had (1) motive (because he was angry that June induced Kathy to break off the relationship with Peterson), (2) had been violent towards June (because he slapped June on one occasion after she called him a "faggot"), and (3) had fabricated an alibi about taking a military entrance exam in Fresno from 9:00 a.m. to noon on the day of the murder.

In opposition, the prosecution noted most of the allegations against Peterson were unsupported by any proffer of corroborating evidence. Indeed, the prosecution noted Jernigan's own documents filed in support of the false alibi claim included a document stating "[t]here is military paperwork showing PETERSON took a Navy entrance written

39

examination in Merced, California, on the day of the murder." The prosecution also submitted a military DD form 1966/4 (initialed by Peterson) establishing he took the exam as he claimed, and provided evidence that the person who signed the form on behalf of the military confirmed Peterson's alibi to police.

The trial court denied the motion as to Peterson. Because there was minimal evidence of motive, no direct or circumstantial evidence linking him to the actual perpetration of the crime evidence of opportunity, and affirmative evidence of *lack* of opportunity, the ruling was not an abuse of discretion.

Dale Wallenius

Jernigan's offer of proof as to his alternative suspect, Dale Wallenius, was that (1) Wallenius had been June's employer and may have stood to benefit from life insurance covering June, (2) June did not like Wallenius, (3) after Wallenius broke up with June's friend (Elaine), June introduced Elaine to another man, (4) Elaine said someone named "Judy" saw Wallenius driving his car on a freeway near June's home on the afternoon of the murder, and (5) Wallenius gave a "false alibi" because he left work "early" on the day of the murder to go out of town with his then-girlfriend, but the girlfriend called Judy Pierce around 2:30 p.m. and told her Wallenius had not yet arrived.

The prosecution opposed the proffer as to Wallenius by asserting (1) there was no evidence of motive because there was no evidence Wallenius was a beneficiary of any life insurance policy on June's life (or had ever collected any insurance proceeds) and Elaine told police June had no involvement in her decision to break up with Wallenius, (2) there was no evidence of false alibi because Wallenius told police he went with his

40

girlfriend to Idyllwild on the day of the murder and that girlfriend confirmed to police they had gone to Idyllwild that day and arrived while it was still light outside. The prosecutor also noted at oral argument that, as to motive, there was no evidence Wallenius stood to reap any financial gain from her death, and the alternative motive posited by the defense (i.e. his alleged anger at June for her role in alienating Elaine from Wallenius) was undercut by the fact he was already romantically involved with a new woman (whom he eventually married) with whom he went out of town that afternoon.

The court found "[t]here's not enough there" and denied the motion as to Wallenius. We reiterate that, under *Hall*, proof of "mere motive or opportunity to commit the crime . . . , without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the *actual perpetration* of the crime." (*Hall, supra*, 41 Cal.3d at pp. 833, italics added.) Merely showing Wallenius was still in town, thus providing him opportunity, is not enough. Nor was the alleged fact that he might have had a financial motive sufficient. (*People v. Pride, supra,* 3 Cal.4th at p. 238 [absent other evidence linking person to actual perpetration of crime, proof that person was beneficiary of life insurance is not sufficient under *Hall*].) The trial court's ruling was not an abuse of discretion.

D. The Competency Claim

Jernigan asserts the trial court erred when it did not suspend the proceedings to conduct a competency hearing.

41

*Background*

At a July 2010 status conference shortly before the then-scheduled trial date, the trial court learned Jernigan wanted to represent himself. Defense counsel expressed concern over whether Jernigan "may not be competent" but was reluctant to "get into the details." The court required defense counsel to go into detail because it had "seen nothing to indicate [Jernigan] has any competence problems." Defense counsel, after prefacing his remarks with the statement that Jernigan "does not agree [and does not] want a [section] 1368 competence proceeding," explained counsel had received numerous items of correspondence from Jernigan that were "bizarre" and had been "progressively getting worse" over the time defense counsel represented him, his "desire to represent himself is somewhat delusional" and is based "upon an irrational belief system that [Jernigan] has," and he should be evaluated by a mental health professional. The prosecution, which opposed delaying the trial date for a competency hearing, asserted the irrational belief system was simply that Jernigan's theory of the case was that he was "being set up because he's black and there's a conspiracy between law enforcement and the DA's office," and there was nothing to indicate Jernigan was not competent or that there had been any change in his belief about the conspiracy.

The court observed that Jernigan "has been a difficult client," but it had "seen no signs" (either in his behavior in court in his papers) suggesting incompetence and the court had "no doubt as to his competence." However, the court also recognized that it could adopt an interim procedure of provisionally refusing to suspend the proceedings under section 1368 for purposes of examining Jernigan's competence, but also appointing

a mental health expert to examine Jernigan and, if the psychiatrist "tells me that there may be problems," the court would then reassess the need for a full competency hearing. Defense counsel agreed with that resolution.

The court then conducted a hearing on what appeared to be a *Faretta*[6] motion. At that time, defense counsel explained this motion actually sought to have Jernigan act as "co-counsel" rather than representing himself, but the court explained that was not "on the table." When the court questioned Jernigan about whether he wanted to give up his right to an attorney and represent himself, he explained he thought the motion was to retain his attorney but to have himself appointed as cocounsel. When the court explained that was not an option, and Jernigan would have to choose between representing himself or keeping his existing counsel, he asked whether "[b]efore I would make that decision" he could have a continuance to discuss this "at length" with the attorney. The court granted a continuance, and also ordered Jernigan to be examined by the expert psychiatrist.

At the next hearing, the court stated it remained comfortable with its previous denial of a section 1368 hearing, and "that ruling is reinforced by [the expert] who makes no bones about it, that your client is a difficult one and not particularly cooperative, but that's the end of that issue." The court, responding to defense counsel's claim that witnesses would testify Jernigan's inability to think rationally meant they "could not effectively deal with him in a rational and effective manner," stated it perceived a

---

6    *Faretta v. California* (1975) 422 U.S. 806.

43

difference between " 'could not and would not' " and the expert's report showed Jernigan acted with normal speech, good eye contact, and got along "fine," but simply was uncooperative.  The court then turned to Jernigan's request to represent himself and confirmed he did not wish to pursue the request at that time.

*Legal Standards*

The conviction of an accused while he or she is legally incompetent violates an accused's due process right to a fair trial.  (*Drope v. Missouri* (1975) 420 U.S. 162, 171-172.)  To be competent, an accused must have the present ability to understand the nature of the proceedings against him or her, to consult with counsel, and to assist in preparing a rational defense.  (*Dusky v. U.S.* (1960) 362 U.S. 402.)

This constitutional principle is embodied in sections 1367 and 1368.  Section 1367 provides a person "cannot be tried or adjudged to punishment while that person is mentally incompetent," and section 1368 implements section 1367 by requiring the court to initiate the process of determining a defendant's mental competence if "a doubt arises in the mind of the judge" as to the defendant's competence.  (§ 1368, subd. (a).)  If the court harbors such doubt, then the judge must state that doubt in the record and inquire of defense counsel whether, in the attorney's opinion, defendant is mentally competent.  Upon request, the court must recess the proceedings as reasonably necessary for counsel to confer with defendant and form an opinion as to the mental competence of the defendant "at that point in time."  (*Ibid.*)  If counsel informs the court that he or she believes defendant "is or may be" mentally incompetent, then the court must order that issue determined in a separate competency hearing and, except in certain circumstances

44

not relevant here (see § 1368.1), must suspend all proceedings of the criminal prosecution until the question of defendant's competence has been decided. (§§ 1368, subds. (b), (c); 1368.1; 1369.)

Importantly, "although a defense counsel's opinion that his client is incompetent is entitled to some weight, such an opinion alone does not compel the trial court to hold a competency hearing *unless the court itself has expressed a doubt* as to the defendant's competence." (*People v. Lewis* (2008) 43 Cal.4th 415, 525.) A trial court's decision whether or not to hold a competency hearing is entitled to deference on appeal because the court has the opportunity to observe the defendant during the proceedings. (*Ibid*.) Although a court must order a competence hearing when it has been "presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial" (*People v. Rogers* (2006) 39 Cal.4th 826, 847), "a defendant must exhibit more than bizarre . . . behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel" (*People v. Ramos* (2004) 34 Cal.4th 494, 508) to warrant a competence hearing. Indeed, a "defendant's unwillingness to cooperate with his counsel did not equate with an inability to assist counsel. . . . [Citations.] If there is testimony from a qualified expert that, because of a mental disorder, a defendant truly lacks the ability to cooperate with counsel, a competency hearing is required. [Citation.] [Where], however, there was no substantial evidence that defendant's lack of cooperation stemmed from inability rather than unwillingness, and the

trial court's comments suggest that it found defendant's problem to be of the latter type rather than the former[,] . . . no competency hearing [is] required." (*Lewis,* at p. 526.)

*Analysis*

We conclude the trial court correctly found no substantial basis for ordering a competency hearing. Although defense counsel stated Jernigan lacked the requisite competence, the court itself harbored no doubts (nor apparently did Jernigan) that he was able to understand the nature of the proceedings against him, to consult with counsel, and to assist in preparing a rational defense, and there is an adequate basis for the court's certainty as to his competence. The court was able to observe Jernigan in court, and was entitled to consider the papers he filed, including a letter written just two months earlier in which Jernigan demonstrated he was more than competent, as he showed he understood that contaminants in a "buffer reagent" could have undermined the persuasiveness of Milton's DNA testing. Indeed, in the precise hearing at which Jernigan's claimed incompetence was first interposed, he (1) asserted a quite rational distinction that he wanted to represent himself as cocounsel with existing counsel remaining to assist him, and (2) recognized the need to consult "at length" with his attorney when the court informed him that his "co-counsel" request was unavailable and he would have to choose between representing himself or having existing counsel remain. Moreover, the evaluation of a mental health professional who examined him reinforced the court's opinion that Jernigan, although "a difficult [client] and not particularly cooperative," was competent. Finally, Jernigan demonstrated his understanding of the nature of the proceedings against him, as well as his ability to consult with counsel and to

46

assist in preparing his defense, when he made the rational decision that (having been rebuffed in his effort to become cocounsel) he would withdraw his *Faretta* motion and would keep his trained counsel. The trial court did not err when it declined to suspend proceedings under section 1368.

E. <u>The Instructional Claim</u>

Jernigan contends the trial court's murder instructions were erroneous because they left the jury with the all-or-nothing choice of convicting of first degree murder or acquitting him of any murder. The instructions, which tracked the language of the murder instructions as they then existed (see CALCRIM Nos. 500, 520 & 521 (Spring 2012 ed.)), explained that Jernigan was charged with murder, which is a type of homicide (CALCRIM No. 500); that to prove his guilt of murder required proof Jernigan acted with either express or implied malice; and (after defining those terms) instructed, pursuant to CALCRIM No. 520, that "[i]f you decide [Jernigan] committed murder, you must then decide whether it is murder of the first or second degree,") and then instructed that Jernigan was "prosecuted for first degree murder under [the] two theories," premeditated and felony murder-burglary, which it then defined. (CALCRIM No. 521.) The instruction on the first degree murder theories concluded with the language that "[t]he requirements for second degree murder . . . are explained in CALCRIM No. 520 . . . [¶] [and the] People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder . . . ." (CALCRIM No. 521.)

47

Jernigan complains the version of CALCRIM No. 521 given, by not including language that explained "all other murders are of the second degree," somehow misled the jury into believing that, if it chose to acquit Jernigan of first degree murder, it was required to acquit Jernigan of all degrees of murder. We are not persuaded by his claim. First, Jernigan does not assert the version of CALCRIM No. 521 given below inaccurately defined the elements for first degree murder or (through its incorporation by reference of CALCRIM No. 520) the elements of second degree murder, or that it inaccurately explained the circumstances under which the jury was required to acquit him of first degree murder. Instead, his claim is that some additional *clarification* was required in the event the jury concluded the prosecution did not meet its burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser murder. The omission of which Jernigan complains, that the jury was not instructed (in the language used in the 2009–2010 version of CALCRIM No. 521) that "[a]ll other murders are of the second degree," appears to have been based on statutory language defining various crimes that fall within first degree murder (such as felony murder) and states: "All other *murders* are of the second degree." (Italics added.) Because we conclude the jury was amply instructed on both types of murder, and the elements for each, the trial court had no sua sponte duty to add language (i.e., "all other murders are of the second degree") that was surplusage, argumentative, duplicative, or potentially confusing. (*People v. Moon* (2005) 37 Cal.4th 1, 30-32.) However, Jernigan forfeited the alleged error by not objecting to the instruction or requesting a modification or amplification. (*People v. Lee* (2011) 51 Cal.4th 620, 638 [when instruction accurately

48

states controlling legal principles, a defendant who believes the instruction requires elaboration or clarification is obliged to request such clarification in the trial court and failure to object and request clarification forfeits any claim of error].)

Moreover, we are convinced the instructions, read as a whole, demonstrates there was no instructional error. The trial court gave CALCRIM No. 520 on first or second degree murder with malice aforethought, which set forth the elements of murder and express and implied malice, and stated: "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree." (See *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092 [CALCRIM No. 520 is an accurate and complete statement of the law].) CALCRIM No. 521 then followed and instructed that to convict for first degree murder, the prosecution had to prove Jernigan acted willfully, deliberately, and with premeditation. The jury was instructed: "The requirements for second degree murder based on express or implied malice, are explained in CALCRIM No. 520.[¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder." The jury was later instructed that it was given "verdict forms for guilty and not guilty of first degree murder *and second degree murder*" and instructed that, if the jury unanimously agreed Jernigan "is not guilty of first degree murder but *also agree* [*he*] *is guilty of second degree murder*, complete and sign the form for not guilty of first degree murder *and the form for guilty of second degree murder*." (Italics added.) We presume jurors are intelligent persons capable of understanding and correlating the instructions

49

given them (*People v. Richardson* (2008) 43 Cal.4th 959, 1028), who understood the instructions as a whole (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321), and followed the instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331.) We conclude there was no instructional error.

### F. The *Marsden*[7] Claim

Jernigan asserts the trial court abused its discretion when it refused his request that new counsel be appointed for purposes of a posttrial motion for new trial based on ineffective assistance of counsel at trial.

*Legal Standards*

The Sixth Amendment right to assistance of counsel encompasses the right of a defendant to substitute another appointed attorney when the record shows the first appointed attorney is not providing adequate representation or when the defendant and the first appointed attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Memro* (1995) 11 Cal.4th 786, 857.) However, the Sixth Amendment right to assistance of counsel only ensures the right to an adequate and competent defense, not the right to present a defense of the defendant's own choosing. (*People v. Welch* (1999) 20 Cal.4th 701, 728.) Accordingly, "[t]actical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by

---

7      *People v. Marsden* (1970) 2 Cal.3d 118.

professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*Id.* at pp. 728-729.)

A defendant has no absolute right to substitute a new appointed attorney for his or her prior appointed attorney, and a trial court is not bound to grant a request for substitute counsel unless the defendant makes a sufficient showing that the right to the assistance of counsel would be substantially impaired if the prior appointed attorney continued to represent the defendant. (*People v. Sanchez* (2011) 53 Cal.4th 80, 87.) When a trial court learns that a defendant seeks to discharge appointed counsel and substitute another attorney based on inadequate representation, the trial court must hold a hearing on the so-called "*Marsden* motion" to permit the defendant to explain the basis of his or her contention and to relate specific instances of the attorney's inadequate performance to allow the court to decide whether to grant the defendant's request. (*Ibid.*) However, the defendant must show inadequate representation, and a showing of mere lack of trust in (or inability to get along with) an appointed attorney is an inadequate basis on which to force a substitution of counsel. (*People v. Clark* (2011) 52 Cal.4th 856, 918.)

The standards for evaluating a postconviction *Marsden* motion are the same as preconviction motions. (*People v. Smith* (1993) 6 Cal.4th 684, 690-696 [motion seeking replacement of appointed trial counsel with new appointed counsel for purposes of new trial motion asserting ineffective assistance of counsel at trial requires same showing and employs same standards as any other *Marsden* motion].) " '[S]ubstitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially

51

impair" the defendant's right to assistance of counsel.' " (*People v. Hart* (1999) 20 Cal.4th 546, 603.) "We review a trial court's decision declining to relieve appointed counsel under the deferential abuse of discretion standard." (*People v. Earp* (1999) 20 Cal.4th 826, 876.)

### *Marsden Hearing and Rulings*

After he was convicted, Jernigan told the court he wanted to bring a motion asserting ineffective assistance of counsel, and the court held its first posttrial *Marsden* hearing. Jernigan told the court he had studied Milton's DNA testing and discovered various failings in her testing, as well as evidence suggesting Milton had falsified a testing run, and he also discovered she had testified in another proceeding that Glazebrook's DNA had been found on a tissue. Jernigan claimed he had provided all this evidence to trial counsel, who was to have used these facts as ammunition in either cross-examining Milton or in direct examination of Jernigan's expert. However, counsel did not do so at trial.

In response, Jernigan's trial counsel (Plourd) explained he had extensively discussed the case with Jernigan. Plourd, who had extensive expertise in DNA evidence and had even been qualified in court as an expert in DNA interpretation, explained that Simon Ford (a preeminent DNA expert) had been on Jernigan's case when Plourd took over, and Plourd had then hired Marc Taylor (another DNA expert) and met with Taylor seven times to examine the DNA evidence. Although Taylor agreed some of Milton's work was sloppy, he told Plourd that Milton's results were accurate and he agreed with the prosecution experts' interpretation of the DNA evidence, and neither Taylor nor Ford

52

had found any evidence Milton had falsified records. Although Plourd had considered each of Jernigan's charges, he explained the DNA evidence against Jernigan came from multiple experts (not just Milton) and it was necessary to have a strategy for dealing with the DNA evidence as a whole rather than just Milton's conclusions. Plourd's cocounsel explained the strategy was to discount the import of the DNA because Jernigan's DNA was not found in inappropriate places in the house, and fighting over the accuracy of the DNA evidence would have been tactically unsound because it would have made the DNA evidence (and where it was found) take on added importance in the jury's eyes.

The trial court denied Jernigan's motion for new counsel. The court noted his allegations required the court to believe the defense experts, who were "preeminent" experts, "did a sloppy job," and the court stated, "I'm not buying it." The court determined that Jernigan was merely "disgruntled" and, because Plourd had examined all of the evidence and "has done it professionally and competently," the motion to replace him as counsel would be denied.

Two months later, on the eve of sentencing, Jernigan made another *Marsden* motion. He claimed Plourd had not contacted him since his conviction and Jernigan did not know anything about the procedure for sentencing or the potential length of his sentence. He also claimed Plourd had tried to induce him to commit perjury at trial but Jernigan had refused. At the hearing, Plourd stated he had been in contact with Jernigan after the verdict (and Plourd's cocounsel stated she had visited Jernigan almost every week), and Jernigan was not ignorant of the sentencing range for the conviction. Plourd also denied trying to convince Jernigan to commit perjury. The court determined there

was "nothing of substance" that would warrant any action by the court and "certainly does not rise to the level where counsel would be relieved . . . under . . . *Marsden*."

*Analysis*

The denial of the first *Marsden* motion was not an abuse of discretion. There was ample evidence counsel's actions were based on a competent and thorough investigation of the facts and represented informed tactical decisions that fell well within the bounds of reasonable advocacy. The denial of the second *Marsden* motion was also not an abuse of discretion. There was ample evidence (1) Jernigan was aware of the sentencing parameters, (2) counsel had remained in contact with Jernigan in advance of sentencing, and (3) counsel's performance at trial was adequate. We are not persuaded by Jernigan's *Marsden* claims.

## DISPOSITION

The court's imposition of a parole revocation fine under section 1202.45 is reversed and, on remand, the court shall strike the parole revocation fine imposed pursuant to section 1202.45. As so modified, the judgment is affirmed.


McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.